IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CIVIL ACTION No.: 7:17-CV-99

| KENNETH R. KENNEDY | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| BRUNSWICK COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

NOW COMES the Plaintiff Kenneth R. Kennedy ("Plaintiff" or "Kennedy"), by and through the undersigned counsel, and files this Complaint complaining of the Defendant, and alleges and states that:

## NATURE OF THE CASE

1. This is a civil action where Plaintiff claims that Defendant treated him differently and worse and paid him less than similarly situated female employees on account of his sex, and terminated him in retaliation for complaining to his management about this issue. Plaintiff seeks unpaid wages, back pay, front pay, liquidated damages, compensatory damages, and equitable and declaratory relief pursuant to the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e ("Title VII"); the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 et seq., as amended by the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d); 42 U.S.C. § 1981a; and the Fair Labor Standards Act, 29 U.S.C. §§ 215 and 216.

## PARTIES

2. Plaintiff, white male, is a citizen and resident of South Carolina. Plaintiff was a resident

of Brunswick County, North Carolina, during the times that he was employed by Defendant Brunswick County.

3. Defendant Brunswick County ("Defendant") is a body politic and corporate existing under and existing by virtue of Chapter 153A of the North Carolina General Statutes.

4. Said body politic is capable of suing and being sued. Said body politic is also a "person" within the meaning of the Civil Rights Act of 1871, 42 U.S.C. §§ 1981, 1983 & 1986.

5. Through its governing body, the Board of County Commissioners, said body politic appropriates funds and establishes the budget for its Code Administration Department and is responsible for ratifying the policies, practices and procedures established and executed by Brunswick County and its Code Administration Department's management, including its pay and employment practices.

6. Defendant is a "political subdivision" of the State of North Carolina within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C. § 203(e)(2)(C).

7. Defendant employed Plaintiff most recently as a Code Inspector IV for its Code Administration Department from on or about May 26, 2015 until he was terminated on or about June 30, 2015.

8. At all relevant times, Defendant employed more than five hundred employees.

## JURISDICTION AND VENUE

9. This case presents an actual case and controversy arising under federal law. This case involves questions of federal law arising under the provisions of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e ("Title VII"); the Equal Pay Act of 1963 as amended, 29 U.S.C. § 206(d); 42 U.S.C. § 1981a; and the Fair Labor Standards Act, 29 U.S.C. §§ 215 and

216. Original jurisdiction over this case is conferred upon this Court pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States.

10. Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendant resides in this District, and the claims asserted herein arose in this District.

**PROCEDURAL AND ADMINISTRATIVE PREREQUISITES**

11. Plaintiffs incorporate by reference and re-allege the allegations in preceding paragraphs as though fully set forth herein.

12. Plaintiff satisfied the procedural and administrative requirements for proceeding under Title VII as follows:

   a) During November of 2015, Plaintiff complained to the EEOC about Defendant's practices and treatment of him, and provided a detailed and signed questionnaire, documents and letters in support of his complaint and Charge of Discrimination.

   b) On December 1, 2015, the EEOC issued a Notice of Charge of Discrimination to Mr. Marty Lawing, County Manager, Brunswick County, advising Defendant that Plaintiff had filed EEOC Charge No. 433-2016-000415, that alleged violations of Title VII and the Equal Pay Act. (Exhibit 1) Said notice was sent within one hundred and eighty days of Plaintiff's June 30, 2015 termination.

   c) On December 9, 2015, the EEOC sent a letter to Plaintiff that advised him that the documents he had submitted to date constituted a charge of employment discrimination and that they sent a notice of such to Defendant, and that included a proposed EEOC Form 5 for him to sign and return within thirty days of the letter. (Exhibit 2)

   d) On December 20, 2015, Plaintiff signed the EEOC Form 5 and mailed it to the EEOC, together with additional supporting documents.

e) The EEOC stamped Plaintiff's executed Form 5 as received on December 29, 2015, within thirty days of the EEOC's letter dated December 9, 2015, which alleged discrimination and retaliation based on sex in violation of Title VII and the Equal Pay Act. (Exhibit 3)

f) On December 30, 2016, the EEOC issued its determination that Plaintiff had engaged in protected activity and that Defendant discharged Plaintiff for engaging in said protected activity. (Exhibit 4)

g) The EEOC attempted to resolve this matter via conciliation, which failed, and then issued a Notice of Right to Sue (Conciliation Failure) for Plaintiff's EEOC Charge No. 433-2016-00415 that has a February 17, 2017 date of signature. (Exhibit 5)

h) The EEOC sent Plaintiff a copy of said notice via the U.S. Postal Service certified mail, Tracking Number 7016 0340 0000 8608 1103, on February 23, 2017, as shown by the postmark on the envelope it was sent in. (Exhibit 6).

i) Said letter was actually delivered and received by Plaintiff on March 6, 2017, as shown by the U.S. Postal Service Delivery Confirmation for said tracking number. (Exhibit 7).

j) This Complaint was filed more than 180 days after the filing of EEOC Charge No. 433-2016-00415 and within 90 days of Plaintiff's receipt of the Notice of Right To Sue letter for said charge.

13. Plaintiff has exhausted his administrative remedies as to his claims in this Complaint.

### FACTUAL ALLEGATIONS

14. Plaintiff incorporates by reference and re-alleges the allegations in preceding paragraphs as though fully set forth herein.

15. In August of 2005, Plaintiff was hired by Defendant as a Code Inspector III and was

promoted to Code Inspector IV in May of 2008.

16. Plaintiff was appointed Interim Chief Building Inspector in April of 2013.

17. In July of 2013, Plaintiff accepted the position of Lead Building Inspector at his same salary of $60,900 when his interim assignment ended.

18. Plaintiff resigned in September of 2013.

19. During this period of Plaintiff's employment with Defendant, Plaintiff received fully satisfactory or better performance ratings and his performance was in fact fully satisfactory or above.

20. Plaintiff left Defendant's employ in good standing.

21. Plaintiff was eligible for rehire by Defendant.

22. Plaintiff worked as a plans examiner for the Department of Planning for the government of the Cayman Islands from September of 2013 to December of 2014.

23. During December of 2014, Plaintiff returned to North Carolina at the conclusion of his work contract in the Cayman Islands.

24. On December 4, 2014, Brunswick County Deputy Director Steve Stone ("Stone") gave Plaintiff a very favorable letter of reference for employment purposes.

25. Plaintiff applied for a Code Inspector IV position advertised by Defendant during the April/May of 2015 timeframe. The position reported directly to Reggie Hucks ("Hucks"), Chief Code Administrator and department head of the Defedant's Code Administration Department, who in turn reported to Steve Stone ("Stone"), Defendant's Deputy County Manager.

26. By letter dated May 14, 2015, Defendant extended Plaintiff an offer to work as a Building Inspector IV at an annual salary of $55,000. The offer was expressly contingent upon only the completion of the results of a "complete background check and a pre-employment drug

screening." The offer expressly stated that the job he was offered included "the standard fringe benefits provided to other Brunswick County employees" and informed him that the Code Administration Department used "compensatory time versus pay for any overtime worked." The offer did not state that he would be hired as a probationary employee.

27. Plaintiff expressed concern about the salary of the position, and was told by Hucks that the salary was not negotiable because it would create dissension if he were offered a higher salary.

28. Plaintiff accepted the Code Inspector IV position effective May 26, 2015 at an annual salary of $55,000.

29. Plaintiff received approximately seventy hours credit for his unused sick time he had accrued during his prior period of employment.

30. Plaintiff received credit for his prior years of service with the Defendant for benefits purposes.

31. Defendant did not furnish Plaintiff a copy of its personnel policy.

32. On June 17, 2015, Defendant provided Plaintiff a paper that contained the web address of a website that had Defendant's personnel policy.

33. Defendant did not properly put Plaintiff's information into their automated time clocking system despite repeated notices from Plaintiff, so his time worked was not accurately recorded.

34. During early June of 2015, Plaintiff heard discussions regarding pay by his fellow co-workers, which was a matter of public record, and understood that Dawn Horne ("Horne"), the only female building inspector IV, earned a salary that was significantly higher than the other male building inspectors.

35. Plaintiff looked up Horne's salary on the website of the local newspaper, where her

salary was listed at $65,000. Plaintiff was concerned, because this was $10,000 a year more than Plaintiff earned.

36. Horne's salary is currently listed on said website as $74,602.

37. Plaintiff looked up Horne's state certifications with the N.C. Department of Insurance, publicly available information, and determined that though they both had five certifications, all of Plaintiff's were the highest levels, Level 3, however only four of Horne's certifications were Level 3 and one was Level 2.

38. Plaintiff looked up Horne's International Code Council (ICC) certifications, publicly available information, and determined that she had approximately ten fewer certifications than his twenty-two certifications, and that she lacked both the Certified Building Official certification, a qualification that many jurisdictions require for their department heads, and the prestigious Master Code Professional, the highest level of certification available, both of which Plaintiff held.

39. Upon information and belief, both Horne and Plaintiff had approximately the same twenty-eight years of relevant work experience.

40. Plaintiff also held a N.C. General Contracting license for both residential and commercial construction from 1998 until 2013.

41. Upon information and belief, Horne and Plaintiff were the only two employees in the Code Administration Department, including Hucks, who held four-year college degrees.

42. During early June of 2015, Plaintiff complained a number of times to Reggie Hucks ("Hucks") that he believed that Horne was paid more than he was because she was a female. When Plaintiff complained, Hucks either ignored him or changed the subject.

43. Hucks' treatment of Plaintiff changed after Plaintiff complained about the sex-based pay

7

differential, in that Hucks treated Plaintiff in the following ways where he did not treat those who had not complained about being paid less than their female co-worker on account of their sex the same way:

    a) Hucks refused to provide Plaintiff a fully functional county vehicle or authorize needed repairs, so Plaintiff was forced to either use an unsafe vehicle with faulty brakes or use a vehicle with no functioning air conditioning, though his co-workers were provided fully functional vehicles that were properly maintained and kept in good repair by the Defendant;

    b) Hucks refused to provide any of the tools Plaintiff required for his job, though the Defendant provided the required tools for Plaintiff's co-workers; and

    c) Hucks spoke belittlingly of Plaintiff in front of his co-workers, as if Plaintiff was a beginning and inexperienced inspector.

44. On or around June 10 of 2015, Plaintiff complained to Hucks again about the disparity in pay between himself and Horne, and his belief that she was being paid more than him on account of her sex.

45. Hucks told Plaintiff that Horne was qualified to earn that amount of money and that he was not.

46. Plaintiff explained to Hucks that his certifications were superior to Horne's and that he was more qualified than she was.

47. Hucks angrily told Plaintiff that he did not want to hear any more about Plaintiff's complaints regarding pay inequity.

48. Plaintiff complained to Stone that Horne made much more than he did though she was less qualified and that he believed this was because Horne was a female, and Plaintiff also told

Stone that he had already complained to Hucks about the issue.

49. Plaintiff's job performance was fully satisfactory.

50. Plaintiff received no written disciplinary write-ups or verbal counseling, and was never told that there were any problems with his performance.

51. Defendant did not inform Plaintiff that he was ever on any probationary status.

52. On June 30, 2005, Plaintiff returned to the office at the end of his work day after completing his field inspections and was told that Hucks wanted to meet with him.

53. Plaintiff went to Hucks' office, and Hucks told Plaintiff that he was terminated effective that day, but did not provide any explanation. Hucks did not offer any written explanation of Plaintiff's termination or ask him to sign any papers, or ask Plaintiff to stay to get or sign any such papers. Plaintiff left and returned to his home.

54. Several days after his termination, Plaintiff received a termination letter dated June 30, 2015 from Hucks. The letter stated that: i) that Plaintiff was in his probationary period, ii) that Plaintiff had not completed a full forty hour work week since he was hired, iii) that Plaintiff had misrepresented his certification status, iv) that Plaintiff had disagreed with some of Defendant's procedural policies and complained that his lower pay was in punishment for his complaints.

55. As discussed above, Plaintiff, who was credited for his prior eight years of service for Defendant, had not been informed that he was on a probationary status. This was not in his offer letter. He was never told this by Hucks or human resources.

56. Hucks' allegation that Plaintiff had not completed a full forty hour week since he was hired was false.

57. Hucks' allegation that Plaintiff had misrepresented his certification status was false.

58. Hucks' admission that Plaintiff disagreed with and was punished for complaining about

Defendant's pay policy because Horne was paid more than Plaintiff on account of sex was correct.

59. The Building Inspector IV position required a technical school diploma supplemented with five to seven years' experience in building inspection or construction or an equivalent combination of education, training and experience that provided the required knowledge, skills and abilities.

60. The salary range for the Building Inspector IV position was $48,508 to $77,603.

61. At the time Plaintiff applied for the Building Inspector IV job in 2015, he met all requirements for the position and he had approximately twenty eight years of relevant experience, including eight years of full time experience with the Defendant in positions that included Building Inspector IV, Lead Building Inspector, and Interim Chief Building Inspector, a four year college degree, twenty-two ICC certifications, including the Certified Building Official certification, a qualification that many jurisdictions require for their department heads, and the prestigious Master Code Professional, the highest level of certification available, and five state certifications, all at Level 3.

62. Upon information and belief, at the time Britt was hired, she had approximately fifteen years of relevant experience, no prior full time work experience with Defendant as a building inspector, only a high school diploma, approximately six fewer ICC certifications that Plaintiff's twenty-two certifications, and she lacked both the Certified Building Official certification, a qualification that many jurisdictions require for their department heads, and the prestigious Master Code Professional, the highest level of certification available.

63. Britt was hired at a $59,400 starting salary, or $4,400 more than Plaintiff, even though Plaintiff had more years of relevant experience, more education, and more and higher level ICC

certifications.

64. Upon information and belief, Hucks hired Horne in January of 2014, Plaintiff in May of 2015, and Britt in August of 2015, and Hucks was the decision-maker as to each of those salary offers as well as to the decision to terminate Plaintiff's employment.

65. Hucks was a Department Head for the Defendant, and was authorized to make said decisions, and said decisions were made in the course and scope of Hucks' job responsibilities for Defendant.

66. Defendant is liable for Hucks' conduct.

## CLAIMS FOR RELIEF

### COUNT ONE
### TITLE VII DISCRIMINATION BASED ON SEX

67. Plaintiffs incorporate by reference and re-allege the allegations in the preceding paragraphs as though fully set forth herein.

68. The Defendant, through its managers, treated Plaintiff, male, differently and worse than other similarly situated employees who were female.

69. The Defendant paid Plaintiff less than similarly situated female employees.

70. Plaintiff's sex, male, played a role in Defendant's decision to pay Plaintiff less than similarly situated female employees, and had a determinative influence on that decision.

71. The unlawful employment practices complained of were intentional.

72. The actions of Defendant as set forth herein constitute intentional discrimination based on Plaintiffs' sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

73. Plaintiff has been injured as a direct and proximate result of Defendant's actions, as alleged herein, and is entitled to recover from Defendant his back wages, front wages for the

value of lost benefits, and compensatory damages for emotional pain, suffering, inconvenience, mental anguish, embarrassment, frustration, humiliation, and loss of enjoyment of life, in an amount to be proved at trial, but in excess of $25,000.00 (Twenty Five Thousand Dollars), together with interest thereon.

74. Plaintiff has incurred attorney's fees in order to enforce his rights and is entitled to recover reasonable attorney's fees necessary for the prosecution of this matter.

## COUNT TWO:
## TITLE VII RETALIATION

75. Plaintiff incorporates by reference and re-alleges the allegations in the preceding paragraphs as though fully set forth herein.

76. As alleged herein, Plaintiff engaged in protected activity when he reasonably opposed what he reasonably believed to be unlawful violations of his rights under Title VII.

77. Defendant's adverse employment actions as alleged herein were in retaliation for Plaintiff having engaged in protected activities: namely reasonably opposing conduct that Plaintiff reasonably believed was in violation of Title VII.

78. Defendant admitted that Plaintiff's complaints were a cause of his termination.

79. Other reasons asserted by the Defendant for Plaintiff's termination are pretextual.

80. Defendant would not have taken the adverse employment actions but for Plaintiff's engagement in protected activities.

81. Alternatively, Plaintiff engaged in protected activity when he reasonably opposed what he reasonably believed to be unlawful violations of his rights under Title VII.

82. Defendant took adverse employment actions against Plaintiff.

83. There is a causal connection between Plaintiff's engagement in protected activity and Defendant's adverse employment actions.

84. Defendant's actions, as alleged herein, were intended to intimidate and chill others from opposing practices made unlawful under Title VII.

85. Plaintiff has been injured as a direct and proximate result of Defendants' retaliation, as alleged herein, and is entitled to his back wages, front wages in the form of lost benefits, and compensatory damages for emotional pain, suffering, inconvenience, mental anguish, embarrassment, frustration, humiliation, and loss of enjoyment of life, in an amount to be established at trial, but in excess of $25,000.00 (Twenty Five Thousand Dollars), together with interest thereon at the prevailing rate.

86. Plaintiff is entitled to recover his reasonable attorneys' fees and costs.

## COUNT THREE:
## EQUAL PAY ACT

87. Plaintiff incorporates by reference and re-alleges the allegations in the preceding paragraphs as though fully set forth herein.

88. Defendant was an employer subject to the provisions of the FLSA.

89. Plaintiff was an employee covered by the provisions of the FLSA.

90. Defendant paid the male Plaintiff at a rate less than the rate it paid to female employees for equal work for performing precisely the same job under similar working conditions.

91. There was no factor other than sex that could explain the pay differential.

92. Defendant violated the Equal Pay Act because it paid the male Plaintiff at a rate less than the rate it paid female employees for equal work for performing the same job under similar working conditions,

93. As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages in the form of lost wages and benefits and liquidated damages, and costs and attorney's fees that may be recovered under 29 U.S.C. §216(b).

## COUNT FOUR:
## FLSA RETALIATION

94. Plaintiff incorporates by reference and re-alleges the allegations in the preceding paragraphs as though fully set forth herein.

95. Plaintiff engaged in activities protected by the FLSA when he complained of Defendant's pay practices.

96. Defendant terminated Plaintiff after Plaintiff engaged in said protected activities.

97. Defendant's termination of Plaintiff was causally related to his engagement in activities protected under the FLSA.

98. Plaintiff has been injured as a direct and proximate result of Defendants' retaliation, as alleged herein, and suffered emotional pain, suffering, inconvenience, mental anguish, embarrassment, frustration, humiliation, and loss of enjoyment of life, in an amount to be established at trial, but in excess of $25,000.00 (Twenty Five Thousand Dollars), together with interest thereon at the prevailing rate.

99. As a direct and proximate result of these actions of Defendant, the plaintiff has suffered damages in the form of lost wages and benefits, compensatory and liquidated damages, costs, and attorneys fees that may be recovered under 29 U.S.C. §216(b).

## DAMAGES

100. Plaintiff incorporates by reference and re-alleges the allegations in preceding paragraphs as though fully set forth herein.

101. As a direct, consequent, and proximate result of the aforesaid acts and omissions of the Defendant, Plaintiff has suffered emotional pain, suffering, inconvenience, embarrassment, mental anguish, the loss of his job and difficulty in finding other employment, damage to his professional reputation and this has also caused Plaintiff economic hardship and pecuniary

losses, including but not limited to loss of past and future wages and benefits.

102. Wherefore, the Plaintiff is entitled to recover from the Defendant compensatory damages for said pecuniary losses, liquidated damages, and inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses in an amount to be established at trial, and costs and attorneys fees to pursue Plaintiff's claims.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, the Plaintiff respectfully prays this Court for relief as follows:

1. That judgment be entered for the Plaintiff and against the Defendant on all counts complained of herein;

2. That the Court enter an Order declaring Defendant's practices complained of herein to be be discriminatory, retaliatory, and unlawful;

3. That the Court enter an Order requiring Defendant to pay Plaintiff front pay;

4. That the Court enter an Order enjoining Defendant from engaging in the unlawful practices complained of herein;

5. That the Plaintiff have and recover of Defendant compensatory damages for emotional pain, suffering, inconvenience, mental anguish, embarrassment, frustration, humiliation, and loss of enjoyment of life as allowed by federal law, including pre-judgment and post-judgment interest;

6. That the Plaintiff be made whole and have and recover of Defendant all back pay, front pay, bonuses, liquidated damages, and benefits losses suffered as a result of Defendant's unlawful actions, including pre-judgment and post-judgment interest;

7. That the Plaintiff have and recover from the Defendant attorneys fees;

8. That the Plaintiffs be granted a trial by jury on all issues so triable.

9. That the costs of this action be taxed against the Defendant; and

10. That the Plaintiffs be granted such other, further, legal and equitable relief as this court may deem just and proper.

This the 23rd day of May, 2017.

**DOGGETT LAW OFFICES**

/s/ Eric L. Doggett
Eric L. Doggett
State Bar No. 39639
3737 Glenwood Avenue, Suite 100
Raleigh, North Carolina 27612-5515
Telephone: (919) 782-2979
Facsimile: (919) 789-2796
E-Mail: Eric@DoggettLawOffices.com